# DUNAVANT v. DUNAVANT.—219 S. W. (2d) 910.

Eastern Section.   February 26, 1949.

Petition for Certiorari denied by Supreme Court, May 6, 1949.

Geo. S. Child, of Knoxville, for appellant.

Cecil D. Meek, of Knoxville, for appellee.

HALE, J.   The present controversy involves the custody of Joanna Maxine Dunavant, five years of age.  The contest is between Buren Lee Dunavant, the father of the child, and her maternal grandmother, Mrs. T. H. Ellis.

Mr. Dunavant married Martha Ellis, the daughter of Mrs. T. H. Ellis, in 1942, and to them was born the child in question.

In February 1947, Mrs. Dunavant filed suit for divorce in the Juvenile and Domestic Relations Court at Knoxville, charging cruel and inhuman treatment. She also sought the custody of this child. Mr. Dunavant answered, denying the allegations made against him and filed a cross-bill charging the wife with cruel and inhuman treatment. In this cross-bill it is averred: "He shows the Court that the grandmother of said child, the mother of the complainant and cross-defendant, Mrs. T. H. Ellis, who resides at Walland, Tennessee, in Blount County, is a fit and proper person to have the care and rearage of said child and that the said Mrs. Ellis is ready and willing to take said child and to give it the proper training and rearage. Cross-complainant realizes that because of his absence from home as a teacher and as a student in the University of Tennessee, that he cannot at this time provide for said child a home comparable to the home of the mother of the cross-defendant."

And one of the prayers is: "That the absolute and exclusive care, custody and control of the minor child, Joanna Maxine be decreed to the maternal grandmother of said child, Mrs. T. H. Ellis, during the nine months of the year in which said child would normally be in school and that the custody, care and control of said child be decreed to the cross-complainant during the three vacation months of each year."

By decree entered March 22, 1947, the original bill was dismissed, and the husband awarded a divorce under his cross-bill. With reference to this child it was adjudged:

"It is further ordered that the care, custody and control of their infant child, Joanna Maxine Dunavant, age 3, be placed in the maternal grandmother, Mrs. T. H. Ellis, of Walland, Blount County, Tennessee, she being

present in Court and agreeing to same, and that the cross-complainant have the right, during his vacation, to have custody and take said child with him, however, his taking said child, shall not, at any time, interfere with her education, and he is enjoined by the Court from removing the ·child, or from keeping her from the maternal grandmother's home so as to interfere with her education.

"The cross-defendant shall have the right to visit and be with said child at the maternal grandmother's home at any and all times, and she, too, is enjoined from taking said child from said maternal grandmother's home so as to interfere with her education. Both parties shall return said child to the maternal grandmother at the time agreed on with said grandmother, at the time of taking said child, and if they are unable to give a definite time to return her, they shall not take the child. Each and all parties are strictly enjoined from "poisoning" the mind of said child or allowing same to be done against either of the other parties. All parties are enjoined from removing the child from the State of Tennessee and the jurisdiction of the Court."

The decree further provided "The cause is retained on the docket and either party may petition the court for adjustment as to the care, custody and control of the child, and the amount for the child's support. This decree is final in all other respects." There was no appeal from the decree.

On Sept. 11, 1947, Mr. Dunavant filed a petition in this cause averring:

"That at the time of the entry of said decree, the cross-defendant, Martha Dunavant, was not a fit and proper person to be the custodian of said child, and the ·cross-complainant, your petitioner herein, was attending school

and could not at that time provide a proper home for said child, for which reason the maternal grandmother was sought and agreed on as custodian during the school months, and your petitioner as custodian during school vacation months. That following the entry of said decree, the cross-defendant has reportedly remarried, and is living with Bruce Lindsey, the man that was most instrumental in breaking up the home of complainant and defendant, and with whom the complainant sought the prayers of a minister that they could marry. That the maternal grandmother is now agreeing to and permitting said child to visit in the home of its mother and the said Bruce Lindsey, which is contrary to the purpose and intent of the decree and against the best interests of the infant daughter, and petitioner seeks that further or any visitation by said child in company with the said Bruce Lindsey cease.

"Petitioner further shows that the home of the maternal grandmother is not now a fit and proper home for said daughter, in that the fact of the marriage of complainant and said Lindsey has caused a dissension in said home, in that the maternal grandfather, for good and sufficient reasons, forbids the said Lindsey to come to the home, and said Grandfather refuses to have any contact or association with said Lindsey, creating a disturbance and upsetting the child when visitations are sought that said child be in the presence of said Lindsey; the grandfather realizing and appreciating the destruction of petitioner's home by the said Lindsey, positively refuses to compromise his position. That the maternal grandmother's home is overcrowded, and a number of small children of his own are in the home, and her duties in the home are such that petitioner's child is not receiv-

ing proper care and attention as said child deserves, or as petitioner could now supply, and said child is left unattended by the grandmother on Friday of each week.''

Answers to this petition were filed by both the former wife and Mrs. Lee in which they deny any right to a change in the custody of the child.

The matters at issue were heard by Judge Webster on Oct. 30, 1947, and by decree entered Nov. 7th, it was adjudged ''there has not been such a change in conditions and circumstances of the parties involved, since the entry of the decree, as to warrant a change or modification of the decree, as to the custody of the child involved.'' There was no appeal from this decree.

On December 10, 1947, another petition was filed by Mr. Dunavant, and is the one involved on this appeal. In it he complains that since the decree last mentioned, Mrs. Ellis has ''assumed an arbitrary and obstinate position, contrary to and in violation of the decree of this court and against the best interest of the child . . . prejudicing and poisoning'' the child against him; that Mrs. Ellis has refused to let him see his daughter; that a family quarrel had taken place in the presence of the child; that Mrs. Ellis was permitting the child to visit her mother without limitation, which made petitioner's visits with his child inconvenient and unpleasant; that on Nov. 4, 1947, when the petitioner was required to return the child he had an altercation with the husband of Mrs. Ellis wherein gun play was threatened, resulting in a peace warrant against Mr. Ellis, which, however, was dismissed; that on Nov. 25, 1947, he, in company with two friends, went to the Ellis home to see and bring his child to Knoxville and was denied the right even to see his child; that on Nov. 27th, he again was refused the

right to see his daughter; and that it would be to the manifest interest of the child to place it in the custody of his parents, Mr. and Mrs. J. W. Dunavant of Scott's Hill, Tennessee.

Mrs. Ellis answered denying most of the allegations, insisting it was the petitioner who was the cause of these disturbances. She admitted she had refused to allow the petitioner to see the child, but said this was because of the groundless peace warrant he had taken out against her husband and that she feared serious trouble; that petitioner had invited her husband to a personal combat; and that she was willing to allow petitioner to visit her home in a peaceful manner. She further asserted there had been no change in circumstances that would authorize the removal of the child from her custody. Later she filed a cross-petition averring that Mr. Dunavant was not a fit person to have part time custody of the child. Mr. Dunavant answered, denying the allegations of the petition and asserting that at the time the child was awarded to the grandmother it was contemplated and agreed he should have the child when he completed his education and established a home; that he had remarried, established a suitable home and was in a position to give her all the care necessary. He summarized his claim to the child as follows:

"Respondent, in humbleness, avers that he is in a position to give to his child at least equal religious training to that now afforded said child in the home of its grandparents.

"That he is able to supply and furnish to the child, physical care superior to that it now receives.

"That he is able to furnish the child with superior home accomodations.

"That he is able to furnish the child with superior sanitary conditions.

"That he is able to furnish the child superior medical attention.

"That he is able to furnish his child a home free from dissension.

"That he is able to teach his child superior manners and English.

"That he is able to supply, without the assistance of grandparents, all of the needs of the child and will continue to do so if his health continues without providential hindrance..

"The aforementioned is not made in criticism of any home that can not be better, but solely to establish that he can do better by his child than its maternal grandparents are doing. She is of his flesh and blood as near as can be, at least nearer than the grandparent."

As is to be expected in cases of this nature, the pleadings reflect quite a bit of ill feeling between the parties, which, of course ultimately fall upon the child.

Upon the voluminous pleadings and much evidence taken before Judge Webster, he decreed there had been no such change of circumstances or conditions as would justify a modification of the decree as pertaining to the custody of visiting of this child. Consequently, the petitions of both Mr. Dunavant and Mrs. Ellis were dismissed. However, the father was ordered to pay $20 per month for the child's support, and in addition was taxed with all cost.

In disposing of the case the trial judge said:

"There is this change of circumstances the court can find its pronouncement of October 13th, entered November 13, 1947 to the present date, or when the issues were

made up in March, 1948, that the father Mr. Dunavant has married, and was married on the 20th day of February of 1948; that he has established a home in Knox County, Tennessee; that is the only change of circumstances I can find that is worthy of the court's mention that have occurred in this lawsuit.

"It can readily be seen that the entry of the decree on November 13th and filing a new petition on December 10th, that the ink had hardly had time to dry upon the decree before a second petition had been filed. This court is not in position to criticize this father for wanting his child; and the court is not in position to criticize the grandparents for wanting the child, nor the mother for wanting the child. The court has the deepest and most sincere respect for them for wanting to have the child, but this decree having been entered into by agreement, and the court having been convinced by these two parties present to said agreement, and having again been convinced on October 20, 1947 that it had placed this child in a good home, although there may be a number of children, this court never has and never shall pronounce judgment upon anyone because of the number of children."

"This marriage of February 20th on the part of the father is still in its early stages, and in the judgment of the court, it is not of sufficient duration for the court to declare the best interests of this child would be to turn the child over to the father and stepmother."

Mr Dunavant filed a motion for a new trial, asserting in substance, (a) That the preponderance of the testimony is in favor of the relief sought by him; (b) that it would be to the manifest interest of the child for him to have its exclusive custody; (c) that the relief sought

is to carry "out the agreement to the parties and not a change in the agreed order as held by the court."

This motion was denied, and this appeal has resulted, with the assignments of error pressing these claims.

Mr. Dunavant has an excellent reputation, although the record indicates he is inclined to exhibit a persecution complex and to be very suspicious, as is indicated by the fact that he would take "witnesses" along when he would go to the Ellis home for his child. This may be the result of his brooding over this litigation.

At the time the custody of the child was committed to the grandmother, Mr. Dunavant was working for a master's degree at the University of Tennessee, which, when obtained, allowed him to obtain employment as a public school teacher, at a fair salary. In February, 1948, he married a young lady employed by the U. S. Department of Agriculture at the University of Tennessee. She sustains an excellent reputation, and planned to resign her position. This would enable her to devote her full time to the care of the child. She says she would do her best to rear the child in a Christian atmosphere and to educate her. They have a three room apartment in Knoxville with a large yard in a good neighborhood and appear to be happily married.

Likewise Mrs. Ellis sustains an excellent reputation, and has done her full part by this child ever since it was placed with her. She and her husband have a small farm, a grist mill, and grocery store in a good rural section of Blount County. They are of fair education and seem to be in reasonable financial condition although not affluent. They have 13 children, of whom 9 live with them, and, with the exception of a baby subsequently born, lived with them at the time the child in question

was placed with them. The environment is such as is to be expected in a large family in a rural section, which certainly is no reflection upon Mr. and Mrs. Ellis and were conditions which existed when they received the child. There is some dissension in the Ellis family over this child, as a married daughter, Mrs. Ruth Bradley, participated in one of the family fusses in behalf of Mr. Dunavant. The child's mother, who has since remarried, sides with her mother, Mrs. Ellis.

Such is this unfortunate picture.

Prior to the rift between the parties, each of the contestants had a high opinion of the other. Mrs. Ellis took the part of Mr. Dunavant against her own daughter in the divorce proceedings, and, as noted, he averred in his divorce bill that she was a "fit and proper person" to have the custody of the child.

Although such a provision was not incorporated in the decree, there was evidently an understanding between Mr. Dunavant and Mrs. Lee to the effect that he would take the child back when he became in a position to do so. On cross-examination of Mrs. Ellis she testified that she and Mr. Dunavant, during the progress of the divorce suit, discussed what was best for the child and then:

"Q. At that time . . . you told him as soon as he could get a home for the child, and even went so far as to say if he re-married and got a proper home for the child he should have the child?   A. I did."

In Stubblefield v. State ex rel., 171 Tenn. 580, at pages 586 to 589, 106 S. W. (2d) 558, 560, it was said:

"Upon the principles of the common law, the father had the exclusive and legal right to the custody and services of his minor child. This was said to be his nat-

ural right, even against the mother. State v. Paine, 4 Humph. [523] (23 Tenn.) 523.

"But under modern law there is no absolute right in the parent to the custody of his own child. The court will hold the welfare of the child superior to the affections of such parents as cannot show themselves qualified to properly care for, educate, and train them. State v. Kilvington, 100 Tenn. [227], 234, 235, 45 S. W. 433, 41 L. R. A. 284.

"Carrying out this enlightened, human consideration this court denied to a father residing in another state the custody of his eight year old son under evidence showing that the father had lost his custody by cruelty to mother and child, and that the child was well taken care of in Tennessee. State ex rel. v. Rose, 167 Tenn. 489, 71 S. W. (2d) 685.

"It is our opinion, however, that the facts should be considered well and the court would not be justified to disregard or fail to properly weigh considerations of parental right. The parent's right is certainly paramount, other considerations being equal. A father is *prima facie* charged with the proper care and is entitled to custody of his child unless that custody is resisted on grounds that he is not fit for the trust, and the objection can only be sustained by a clear preponderance of convincing proof. The presumption is in his favor in the absence of a clear showing that he is disqualified for the proper discharge of parental duty. The court cannot lightly, and without good cause, invade the natural right of the parent to the custody, care, and control of his infant child.

"As stated in Hernandez v. Thomas, 50 Fla. 522, 39 So. 641, 645, 2 L. R. A., N. S., 203, 111 Am. St. Rep. 137, 7 Ann. Cas. 446:

" 'In accordance with the prevailing rule in the American courts, that in awarding the custody of children the paramount consideration is the welfare of the child, rather than the technical legal right of the parent. While this is true, yet the court should not lightly and without good cause invade the natural right of the parent to the custody, care, and control of his infant child.'

"In the case of State ex rel. v. Richardson, 40 N. H. 272, the Supreme Court of that state held:

" '*Prima Facie*, however, the right of custody is in the father; and when the application is resisted upon the ground that he is unfit for the trust, by reason of grossly immoral conduct, harsh usage of his child, or other cause, a proper regard to the sanctity of the parental relation will require that the objection be sustained by clear and satisfactory proofs.'

"This proposition of law was likewise clearly stated in the case of State ex rel. v. Martin, 95 Minn. 121, 103 N. W. 888:

" 'The right of a parent to the care and custody of his minor child is, both at common law and under the statute, paramount and superior to the right of a third person. The presumption is that the parent is a fit and suitable person to be intrusted with the care of his child, and the burden is upon him who asserts the contrary to prove it by satisfactory evidence.'

"We quote from 46 C. J., pp. 1228-1230:

" 'A parent who is of good character and a proper person to have the custody of the child and is reasonably able to provide for it ordinarily is entitled to the custody

as against other persons and this rule applies although such others are much attached to the child and the child is attached to them, and prefers to remain with them, and they are in all respects suitable to have the custody of the child and able to support and care for it, or even though they are better able to afford the child material advantages.'

"It is further stated in above authority that these rules have been applied in favor of father or mother against grandparents, aunts, and uncles, maternal or paternal.

"In Clarke v. Lyon, 82 Neb. 625, 631, 118 N. W. 472, 474, 20 L. R. A., N. S., 171, it is said:

" 'The court has never deprived a parent of the custody of a child merely because on financial or other grounds a stranger might better provide. The statute declares and nature provides that the right shall be in the parent, unless the parent be affirmatively unfit.'

"We need not multiply authorities. The foregoing are typical of the strong current of judicial thought in our country."

Mr. Dunavant is the father of the child. He is morally fit and financially able to support it. The agreement made between him and Mrs. Ellis indicates his interest in the welfare of his child, and evinces his ultimate purpose of making a home for her. He has a home and a good wife. While not in the least minimizing the love and care bestowed by Mrs. Ellis upon the child, the inescapable fact remains that Mr. Dunavant is her father and, under this record, can give her more advantages than the grandmother.

■ We think it to the great interest of the child that her exclusive custody be given the father. So long as there is a divided custody there will probably be bicker-

ings and disputes and a natural tendency on the part of the child to play one against the other, as well as for the claimants to seek by indulgences to curry favor with the child, if not to prejudice it against the other. We think the change in the father's financial and marital status, and the unfortunate differences between him and Mrs. Ellis were ''changes of circumstances'' reflecting on the child's welfare. State v. French, 182 Tenn. 606, 188 S. W. (2d) 603.

■ ■ As was observed by Judge Felts, in Logan v. Logan, 26 Tenn. App. 667, 176 S. W. (2d) 601, at pages 603, 604:

''We do not think the former decrees constitute *res adjudicata* of the question before us. All of them retained the cause in court, according to Code section 8454, which provides that such a decree shall remain within the control of the court and be subject to such changes or modifications as the exigencies of the case may require. Ordinarily a former decree of custody is regarded as *res adjudicata* upon the facts then existing and in the absence of any changed conditions requiring a change of the custody. But we think conditions have changed in the present case since the first decree was entered dividing the custody. This litigation has been waged with a fierceness characteristic of such unhappy controversies. It has naturally stirred deep emotions and bitter feelings on both sides, which have continued to grow more intense. The child has now reached the age at which he cannot be isolated from these unhappy consequences. He is also approaching school age and, as the learned trial judge observed, new and serious difficulties will continue to arise from this division of the custody.

"It is generally very unwise to divide the custody of a child between contending parties because it is hardly possible for a child to grow up and live a normal, happy life under such circumstances. Many cases have recognized this. Larson v. Larson, 176 Minn. 490, 223 N. W. 789; Campbell v. Campbell, 96 N. J. Eq. 398, 130 A. 361; Brock v. Brock, 123 Wash. 450, 212 P. 550; Towles v. Towles v. Towles, 176 Ky. 225, 195 S. W. 437; McCann v. McCann, 167 Md. 167, 173 A. 7; Martin v. Martin, Tex. Civ. App., 132 S. W. (2d) 426. In the latter case it was said (132 S. W. (2d) 428):

" 'In our opinion, the original decree awarding the child part time to each of the parents was unwise. Certainly, no child could grow up normally when it is hawked about from one parent to the other with the embarrassing scene of changing homes at least twice each year. Such decrees are usually prompted by a laudable desire to avoid injuring the feelings of the parents, but the net result is a permanent injury to the child without any substantial benefit to the parents. In addition to the lack of stability in his surroundings, the child is constantly reminded that he is the center of a parental quarrel. It is readily apparent that such practices are calculated to arouse serious emotional conflicts in the mind of the child and are not conducive to good citizenship. Moreover, the parents are continuously pitted against each other in the unenviable contest of undermining the child's love for the other parent. Each parent is afraid to exercise any sort of discipline for fear of losing out in the contest. As a result, the child is reared without parental control. Such decrees by which the child is awarded part time to each of the parents have been condemned by numerous decisions. 19 C. J. p. 344,

sec. 797, and authorities cited in Note 27; Swift v. Swift, Tex. Civ. App., 37 S. W. (2d) 241.' "

See also Rowles v. Reynolds, Tenn. App., 196 S. W. (2d) 76, at page 80.

In our opinion the mother of the child should have the right to see it at such reasonable times or places as may be agreed upon or fixed by subsequent decrees of the lower Court.

The judgment below is reversed and judgment here in favor of appellant awarding him the exclusive custody of this child.

In our discretion, we tax appellant and sureties with all cost below and on this appeal.

Reversed and remanded for such further proceedings as may be required.

McAmis and Howard, JJ., concur.